# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

**JOHN GARY SMEDLEY,**

     **Plaintiff,**

**-vs-**                                 **Case No. 2:12-CV-00382-38-DNF**

**COMMISSIONER OF SOCIAL SECURITY[1],**

     **Defendant.**

_____/

# REPORT AND RECOMMENDATION

**TO UNITED STATES DISTRICT COURT**

This cause is before the Court on Plaintiff's Complaint (Doc. 1) filed on July 17, 2012. Plaintiff, Gary John Smedley, seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for Disability Insurance Benefits and Supplemental Security Income.   The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties filed legal memoranda in support of their positions.   For the reasons set out herein, it is respectfully recommended that the decision of the Commissioner be **Affirmed** pursuant to 42 U.S.C. § 405(g).

## I.     Social Security Act Eligibility, Procedural History, and Standard of Review

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Commissioner Michael J. Astrue as the Defendant in this suit. FED. R. CIV. P.  25(d). No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § § 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § § 404.1505-404.1511.

### A.     Procedural History

On November 15, 2005, Plaintiff applied for a period of Disability Insurance Benefits ("DIB"), alleging his disabling condition began on January 1, 2004. (Tr. 38, 204). On August 1, 2006, Plaintiff filed for Supplemental Security Income payments alleging the same onset date. (Tr. 197). Both claims were initially denied on November, 9, 2006, and upon reconsideration on February 21, 2007. (Tr. 127, 130, 147, 151). On March 23, 2007, Plaintiff filed a Request for Hearing by an Administrative Law Judge ("ALJ"). (Tr. 155). A video hearing was scheduled and held on April 24, 2009, where Plaintiff appeared in Fort Myers, Florida and ALJ Irwin Bernstein presided from West Palm Beach, Florida. (Tr. 80-83). At the hearing the Plaintiff requested to amend his onset date to April 9, 2007. (Tr. 84). The ALJ issued a partially favorable decision, because he found the Plaintiff ". . . was not disabled prior to February 4, 2009, but became disabled on that date and has continued to be disabled through the date of [his] decision." (Tr. 119). On July 2, 2009, the Plaintiff filed a Request for Review of the ALJ's decision. (Tr. 324). The Appeals Council vacated the ALJ's decision on April 23, 2010, and remanded the case back to an ALJ because the hearing decision did "not contain sufficient rationale with references to specific evidence in support of the established findings and conclusions for either the favorable or unfavorable parts of the decision." (Tr. 188-192).

A second hearing was held by ALJ Ronald Robins on January 14, 2011, in Fort Myers, Florida. (Tr. 36-55). Plaintiff appeared and testified along with an impartial vocational expert ("VE"). (Tr. 36-55). On May 19, 2011, the ALJ issued an unfavorable opinion denying Plaintiff of any benefits, finding Plaintiff was not disabled under Section 1614(a)(3)(A) of the Social Security Act. (Tr. 28). Plaintiff again filed a Request for Review of Hearing Decision. (Tr. 8). On June 8, 2012, the Appeals Council denied Plaintiff's Request for Review. (Tr. 1). On July 17, 2012, Plaintiff filed a Complaint in the United States District Court for the Middle District of Florida. (Doc. 1). The instant action followed (Doc. 42) and the matter has been fully briefed and referred to the undersigned for issuance of a Report and Recommendation.

### B.     Standard of Review

The scope of this Court's Review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richards v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate support to a conclusion." *Crawford v. Comm'r*, 363 F.3d 1155, 1158 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1426, 1439 (11th Cir. 1997); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)).

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as fact finder, and even if the reviewer finds that a preponderance of evidence goes against the Commissioner's decision. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). The District Court may not " . . .

decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Id.* (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

## II.     Review of Facts

### A.     Background Facts

At the time of the ALJ's opinion Plaintiff was fifty-one (51) years of age. (Tr. 40). Plaintiff has a high school education. (Tr. 40). He is divorced and has only adult children. (Tr. 40). At the time of his second hearing, Plaintiff was living with his daughter but had previously been homeless. (Tr. 40, ). Plaintiff is able to care for himself. (Tr. 291, 266). His son completed a Function Report in which he listed Plaintiff as being able to clean his home, including laundry; make some household repairs; and complete some yard work, including mowing. (Tr. 267). In the report, he also stated that Plaintiff was able to go out alone and usually walked or rode his bike to get around. (Tr. 268). Plaintiff attends church once a week, and also attends AA meetings three times a week. (Tr. 294, 269). Plaintiff last worked in 2008, earning only $57.72 which does not amount to substantial gainful activity. (Tr. 15). Prior to his onset, Plaintiff worked as a carpenter and construction laborer (considered heavy work). (Tr. 22).  Plaintiff alleges that he stopped working because he could not handle the work and his disc pain. *Id.* At the time of the hearing Plaintiff received food stamp benefits as well as Medicaid.[2] (Tr. 41, Doc. 2). Initially Plaintiff alleged a disability onset date of January, 1, 2004; however Plaintiff amended his onset date to April 4, 2007, at his initial hearing. (Tr. 97, 84). His alleged disabling conditions were listed as diabetes; psychiatric problems; bulging discs; and pinched nerves in neck and arm problems. (Tr. 254).

### B.     The ALJ's Findings

---

[2] Plaintiff testified that his Medicaid had expired but his daughter was reapplying for the benefit on his behalf. Additionally, although not substantiated by the record, Plaintiff was asked if he received disability at his second hearing to which he responded in the affirmative. (Tr. 41). Plaintiff also told Dr. O'Harra that his current source of income was disability benefits he had been receiving for a year and three months. (Tr. 936).

At step one, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2012, and had not engaged in substantial gainful activity after his amended onset date April 9, 2007. (Tr. 15). The ALJ noted that although the Plaintiff worked in 2008, the earnings posted were "not enough . . . to be considered substantial gainful activity and [is] considered an unsuccessful work attempt." (Tr. 15).

At step two, the ALJ found Plaintiff had a combination of severe impairments: diabetes mellitus (DM) controlled, with mild neuropathy; chronic cervical pain and strain with radiculopathy, status post microdiscectomy in 2007 with fusion; chronic right shoulder pain (dominant) secondary to rotator cuff tear and syndrome; coronary artery disease (CAD); hypertension; and hypercholesterolemia. (Tr. 15). The ALJ made these findings after reviewing the medical evidence on record, and determined that the combination of impairments caused a significant limitation in Plaintiff's ability to perform basic work activities. *Id*. Plaintiff's record indicates a history of substance abuse. (Tr. 15). The ALJ found that Plaintiff's record had significant documentation indicating that he would have no more than mild mental limitations if he remained sober and compliant to his treatment. (Tr. 15). The ALJ also noted that Plaintiff's record "does not substantiate a total disability at any time, whether or not his substance abuse is considered," thus finding his substance abuse to not be material to the determination of Plaintiff's disability claim. (Tr. 15).

At step three, the ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 20). In making his findings, the ALJ considered whether the "paragraph B" criteria of listing 12.04 were met. (Tr. 16–20). The ALJ found Plaintiff did not meet the "paragraph B" criteria because Plaintiff's mental impairment of depressive disorder caused no

more than a mild limitation in any of the three functional areas and he had no episodes of decompensation each of extended duration[3]. (Tr. 19). The ALJ explained that Plaintiff's mental impairment does not significantly diminish his ability to "understand, remember, and carryout simple, routine instructions; use judgment; respond appropriately to supervisors and co-workers; or deal with routine work changes and stresses in the work place." (Tr. 19).

At step four, the ALJ found Plaintiff had the residual functional capacity ("RFC") to perform a wide range of light work, or work which requires maximum lifting of 20 pounds and frequent lifting of up to 10 pounds as defined in 20 C.F.R. § 404.1567. (Tr. 20). The ALJ further found that the evidence of record supported an RFC finding that:

> [Plaintiff] is not able to lift and carry more than 20 pounds or more than 10 pounds on a regular basis. The [Plaintiff] can sit 4 hours in an 8-hour workday, stand 3 hours in an 8-hour day, and walk 3 hours in an 8-hour day. [He] can never reach overhead, and can occasionally climb ladders/ropes/scaffolds and balance. [He] can occasionally work around unprotected heights, other workplace hazards, and humidity and wetness. [He] can never work around dusts, odors, fumes, etc., extreme cold or heat, loud noises, and vibrations. [Plaintiff] has no severe mental limitations established.

(Tr. 19-20). Using the two-step approach, the ALJ first found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they are inconsistent" with the Plaintiff's RFC. (Tr. 24).

At step five, the ALJ found Plaintiff was not able to perform his past relevant work as a carpenter and construction laborer. (Tr. 26). The ALJ relied on the vocational expert to determine that Plaintiff's past relevant work of a carpenter was medium and a construction

---

[3] The ALJ noted that although Plaintiff has been hospitalized on multiple brief occasions, those admissions appear to be primarily related to his substance abuse. Additionally, he noted these episodes of decompensation were all of short duration and Plaintiff stabilized quickly once sober.

laborer was heavy work activity. (Tr. 26). The ALJ determined that Plaintiff's past relevant work exceeded his residual functional capacity and therefore, Plaintiff was unable to perform his past relevant work. (Tr. 26). The ALJ concluded that with Plaintiff's age, education, work experience, and residual functional capacity that there are jobs that exist in the national economy that he can perform. (Tr. 26). The ALJ found Plaintiff was not able to perform a full range of light work and engaged a vocational expert to determine what jobs Plaintiff was able to perform with his limitations. (Tr. 26-27). The ALJ determined that Plaintiff has the ability to work as an office helper, mail sorter, and survey worker. (Tr. 27). The ALJ concluded that Plaintiff is not under a disability. (Tr. 27).

### C. Vocation Expert Testimony

The ALJ presented hypotheticals questions to Vocational Expert Donna Taylor ("VE"). (Tr. 50-51). The first hypothetical included the following:

> I have a, I have a 48 year old, I have a 48 year old male with work history such as claimant and a high school education with the following limitations. The individual could frequently lift 10 pounds, occasionally lift 20 pounds. Stand and/or walk about six hours in an eight hour day. Sit about six hours in an eight hour day. Unlimited with regard to pushing and pulling of hand and foot controls. The individual is unable to climb ladders, ropes, and scaffolds. Frequently climb ramps and stairs, balance, stoop, kneel, crouch, crawl. The individual needs to avoid concentrated exposure to moving machinery and unprotected heights. And in addition the individual has a mild limitation[] with regard to activities of daily living and maintaining concentration, persistence, and pace. Moderate limitation in maintaining social functioning. The individual has the capacity to follow work like procedures and instructions, reflect adequate attention, concentration to sustain focus and [] in completing certain requirements. Retains the capacity to appropriately interact with others in a structured setting, somewhat decreased adaptability although not compromised. Retains the capacity of adjusting to a work environment. Would such an individual be able to perform any of the past relevant work of the claimant?

(Tr. 49-50). The VE responded no. Then the ALJ asked if there was any unskilled work in the economy and the VE responded that the individual could be a cashier, office helper or

small products assembler, which are classified as light work and there are a number of jobs in the

area, state and nationally.  (Tr. 50-51).

The ALJ presented the following as a second hypothetical:

The next hypothetical, we have a 51 year old male, other background stays the same, with the following limitations.  Could occasionally lift up to ten pounds and carry up to ten pounds.  Could sit three, sit four hours in an eight hour day.  Three hours standing in an eight hour day.  Three hours walking in an eight hour day. The individual would be unable to reach overhead with the dominant hand, dominant arm and reaching in all other directions with the dominant arm would be occasional.  No other restrictions with regard to right or left hand activity.  The individual could occasionally climb ladders, scaffolds, occasionally balance. Frequently climb ramps and stairs, stoop, kneel, crouch, crawl.  The individual could frequently move mechanical parts.  Occasionally deal with unprotected heights, and humidity, and wetness.  And be unable to, is unable to tolerate dust, odors, fumes, and pulmonary irritants, extreme cold, extreme heat, vibrations. The individual had moderate limitations with regard to noise but could tolerate about an office setting and that's it.  Would such an individual be able to perform any of the past relevant work of the claimant?

(Tr. 51).  The VE testified that this individual would not be able to return to Plaintiff's

past relevant work, but would be able to perform light work of an office helper, mail sorter and

survey worker. (Tr. 51-52).  All of these jobs have a number of positions in this area, in the state,

and nationally.  (Tr. 51-52).

The ALJ continued and asked the VE to use the last hypothetical and add the following:

The individual would have a moderate limitation, moderate defined more than a slight limitation in this area but [the] individual's still able to function satisfactorily, in carrying out complex instructions and the ability to make judgments and complex work related decisions.   The following are light limitations but the individual can generally function well.  Understand, remember, and carrying out simple instructions, responding appropriately to usual work situations and to changes in a routine work setting.  Any changes in your last answer?

(Tr. 52-53).  The VE responded no.  The ALJ then changed the last hypothetical to add

that the individual was able to lift fifteen to twenty pounds, and the VE determined that the

individual could be an unskilled cashier or unskilled office worker.  (Tr. 53).  The ALJ then added that the individual could lift 15 to 20 pounds, and asked if the individual would be able to be a survey worker, mail sorter, or office helper and the VE responded yes. (Tr. 53). The VE also opined that an individual with the limitations as testified to by Plaintiff would not be able to be employed.  (Tr. 54).

### D.    Medical Evidence
*Psychological Impairments*

In 2001 and 2002 Plaintiff was Baker Acted on two occasions. (Tr. 444–45, 452). On both occasions Plaintiff was diagnosed with alcohol dependence, and alcohol induced mood disorder. (Tr. 445, 448). In 2003 Plaintiff was admitted to Charlotte County Medical Health Services ("CCMHS") on two occasions for alcohol dependence, June 5, 2003, and October 22, 2003. (Tr. 457-59, 463). On both occasions Plaintiff was discharged on the day following admission. (Tr. 457, 463).

On November 24, 2004, Plaintiff was admitted to CCMHS for "treatment of depression, suicidal thoughts, noncompliance with medication, alcohol abuse and revealed a flushed face, [illegible], slurred speech and smell of alcohol," with a final diagnoses of substance induced mood disorder and alcohol dependence. (Tr. 427–28). On December 10, 2004, Plaintiff was once again Baker Acted at CCMHS due to a suicidal attempt of insulin overdose and was noted to have a diagnosis of alcohol dependence and alcohol induced depression. (Tr. 437).

Plaintiff underwent an evaluation with Accurate Assessments for "chemical dependency due to STAR Grant Protocol" on January 15, 2004, in order to enter Gateway Community Services. (Tr. 378-84). Plaintiff was diagnosed with alcohol dependence. (Tr. 383). Plaintiff was

admitted to the STAR Program with Gateway for alcohol dependence. (Tr. 412). On February 18, 2004, Plaintiff left against medical advice (Tr. 413, 418).

Plaintiff was hospitalized at Shands Clinic of Jacksonville from February 19, 2004 to February 24, 2004, after he overdosed on insulin. (Tr. 358-363). Plaintiff's discharge diagnosis included substance-induced mood disorder, alcohol dependence, cocaine abuse and a GAF of 65. (Tr. 358). Plaintiff was admitted to STAR Outpatient Treatment with Gateway following his discharge from Shands. (Tr. 413, 419).

Plaintiff was admitted to Gateway Detox from May 11, 2004 through May 18, 2004 for alcohol and crack cocaine. (Tr. 413, 425). Plaintiff was readmitted to STAR Day/Night Treatment after detox on May 20, 2004. (Tr. 413, 416-18). Plaintiff again left treatment against medical advice on July 16, 2004, despite the fact that he had been making outstanding progress. (Tr. 413, 418). Plaintiff was admitted to detox on November 8, 2004, and January 26, 2005, with Gateway. (Tr. 400, 413–14, 392). Plaintiff's one year of service ended on February 1, 2005, and he was discharged from Gateway in poor condition. (Tr. 414). Plaintiff returned to detox at Gateway on September 5, 2005, for alcohol and opiate dependence. (Tr. 401, 407, 403, 404).

On September 30, 2005, Plaintiff went to the Emergency Room ("ER") at Lee Memorial Health Systems (LMHS), for suicidal/homicidal ideation and Plaintiff was Baker Acted. (Tr. 482, 502-04, 527-29). After evaluation by psychiatry services, the Baker Act was discontinued and Plaintiff was transferred to Ruth Cooper's crisis stabilization unit for further psychiatric care. (Tr. 482, 694). Upon admission Plaintiff explained that his problems had started when his wife divorced him due to excessive drinking. (Tr. 703). On October 12, 2005, Plaintiff was brought to the ER at LMHS for acting inappropriately on a street corner and was later Marchman-Acted. (Tr. 501). On October 17, 2005, Plaintiff was brought to the ER at LMHS after drinking two pints

of vodka.  (Tr. 480, 499, 526).  Plaintiff presented intoxicated to the ER at LMHS on October 30, 2005, with a chief complaint of wanting to get off heroin and was Marchman-Acted for further observation once stabilized. (Tr. 498–99). On October 31, 2005, Plaintiff was again brought to the ER at LMHS after he was found by the police and had a blood alcohol level of .300, once stabilized Plaintiff was re-Marchman-Acted. (Tr. 497–97).

Plaintiff underwent a psychological evaluation by Dr. Louis P. Garzetta on March 13, 2006. (Tr. 468). Dr. Garzetta noted that Plaintiff has problems controlling his diabetes due to his abuse of alcohol and lack of compliance. (Tr. 468-69). Additionally it was noted that Plaintiff has suffered from alcohol abuse since the age of 16 and has only had brief periods of sobriety since. (Tr. 470). Dr. Garzetta noted that Plaintiff's thought processes were logical and coherent but had difficulty with past memory, but attributed that to his frequent intoxication. (Tr. 470). After administering several neuropsychological tests, Dr. Garzetta noted that Plaintiff is not likely to be able to work in the construction field but would be a suitable candidate for a more sedentary occupation with some vocational training. (Tr. 473). Plaintiff was ultimately diagnosed with "alcohol dependence in early full remission; mood disorder due to worsening orthopedic and neurological problems, diabetes, with depressive features; dysthymic disorder early onset; and disorder of written expression." (Tr. 474).

On April 8, 2006, Plaintiff was admitted at LMHS with persistent vomiting, hyperglycemia and alcoholism. (Tr. 523, 478, 480). On April 20, 2006, Plaintiff referred himself to Ruth Cooper after having been discharged from a halfway home for drinking. (Tr. 686). Plaintiff was admitted to the crisis stabilization unit with CCMHS on November 18, 2006, under the Baker Act. (Tr. 743). Plaintiff was severely intoxicated upon admission with an alcohol level above .300 requiring transfer to Charlotte Regional Hospital. (Tr. 746).

Plaintiff was Baker Acted on May 25, 2007, with Ruth Cooper after threatening to "end his life because he was an addict." (Tr. 672). On May 12 through May 16, 2007, Plaintiff was admitted to Peace River Medical Center for treatment for an insulin overdose suicide attempt. (Tr. 876). Plaintiff was brought to LMHS on June 11, 2007, with a chief complaint of "I want detoxification," and reported to be acting paranoid. (Tr. 721). Plaintiff was administered a CT scan which was unremarkable. (Tr. 729). Plaintiff was found to be hypoglycemic, and was returned to SWAFS for detox in stable condition. (Tr. 722).

Plaintiff presented to Fawcett Memorial Hospital on July 8, 2007, after being found wandering in someone's house with uncontrolled diabetes and substance abuse. (Tr. 776). Plaintiff was to be transferred to inpatient psychiatric rehabilitation under the Baker Act. (Tr. 778, 775).

Plaintiff was referred to Edward F. Tilson, Ph.D., by Penni Hoculi from the Office of Vocational Rehabilitation in Port Charlotte, Florida for a general personality, vocation and interest evaluation on September 12, 2007. (Tr. 732). It was noted that Plaintiff traveled by bicycle, arrived early but his appearance was unkempt and had strong body odor. (Tr. 733). Dr. Tilson conducted a psychological evaluation and administered several psychological tests— Weschler Adult Intelligence Scale III (WAIS III); ZUNG Self Rating Depression Scale; Wide Range Achievement Test 4 (WRAT4); Wide Range Interest and Occupational Test (WRIOT2). (Tr. 732-34). The WAIS III revealed Plaintiff had low average verbal abstract ability; was borderline for word knowledge, immediate memory/concentration, general fund of knowledge/long term memory and visual discrimination; and scored extremely low on social judgment, overall visual motor coordination and speed. (Tr. 734). Dr. Tilson noted that those results "may be an underestimate of his true abilities and may be due to problems with

concentration/attention caused by either the effects of low blood sugar, depression or alcohol." (Tr. 734). The WRIOT2 results indicated his highest interest area for jobs that include manipulation of tools, machines and things. (Tr. 734). The Zung Test revealed marked depression and alcohol dependence;[4] and he was neglecting medical and personal care due to his homelessness, depression and alcohol dependence. (Tr. 734). Dr. Tilson's diagnostic impression included Alcohol Dependence; Alcohol Induced Psychotic Disorder, with hallucinations (in partial remission); Major Depressive Disorder, recurrent, severe with psychotic features; Cognitive Disorder NOS; and Personality Disorder NOS. (Tr. 735). After receiving a history from Plaintiff[5] and conducting the tests, Dr. Tilson concluded that Plaintiff was "not capable of competitive employment" at that time. (Tr. 735).

On October 2, 2007, Plaintiff entered rehab at Charlotte Behavioral Health Care. (Tr. 736). It was noted that Plaintiff was oriented to person, time, place and situation; attention, concentration, short term and long term memory were intact; and judgment, behavior and language were all normal or good. (Tr. 739). Plaintiff's diagnostic impression was noted as Major Depressive Disorder in partial remission and Alcohol Dependence (6 weeks sobriety). (Tr. 741).

Plaintiff presented to the ER at Peace River for acute alcohol withdrawal on November 11, 2007, but Plaintiff signed out against medical advice on November 13, 2007. (Tr. 873-74). Plaintiff was admitted to the ER at Peace River for an insulin induced suicide attempt on November 25, 2007, but signed out against medical advice in less than 24 hours. (Tr. 871-72).

---

[4] Dr. Tilson noted "[a]lthough [Plaintiff] has not consumed alcohol in four weeks, it is likely that he continues to exhibit a significant alcohol dependence given his long history and his current level of functioning."

[5] It is important to note that Plaintiff did not provide a completely accurate description of his medical history. Dr. Tilson noted in Plaintiff's "Identifying Data and Background Information" that Plaintiff admitted to the use of marijuana but "denie[d] any past or present use of other illicit drugs." (Tr. 732). This information is clearly inaccurate as evidenced by the majority of the evidence of record.

On November 27, 2007, Plaintiff was admitted to the Crisis Stabilization Unit ("CSU") at CCMHS after he went to the ER and took some insulin. (Tr. 925). Plaintiff was diagnosed with Major depression, recurrent, moderate and alcohol dependence in partial remission. (Tr. 925). Plaintiff was voluntarily escorted to the CSU on December 6, 2007, after he had been drinking heavily and requested an inpatient substance abuse program but was discharged the following day at his request. (Tr. 916). On December 17, 2007, Plaintiff was once again admitted to Peace River's ER for an insulin induced suicide attempt but again left against medical advice within 24 hours. (Tr. 868-70).

Plaintiff was brought to the CSU at CCMHS on May 2, 2008, under the Baker Act after expressing thoughts about killing himself. (Tr. 907). Plaintiff was intoxicated when he presented and was transferred to the ER for medical clearance. (Tr. 907). Plaintiff was later admitted to the CSU and was advised to be discharged to inpatient substance abuse program, but he refused. (Tr. 908). Plaintiff was again escorted to the CSU on February 26, 2009, due to Plaintiff's increased drinking, depression and suicidal statements. (Tr. 900, 894). Plaintiff was discharged on March 1, 2009, with instructions to attend AA. (Tr. 900).

*Physical Impairments*

On January 18, 2002, Plaintiff was brought to the ER with LMHS after he suffered diabetes related loss of consciousness on the job and sustained a head laceration. (Tr. 518).  His diagnosis was listed as syncope secondary to hypoglycemia and scalp laceration. (Tr. 520). Plaintiff presented to the ER at LMHS on March 4, 2002, with complaints of a headache associated with a head injury sustained two weeks prior where a CT Scan was performed revealing no internal injuries. (Tr. 515).

On April 27, 2005, Plaintiff presented to the ER at LMHS with complaints of neck pain and right arm pain. (Tr. p. 512-13). He was prescribed pain medication and advised to follow up with a neurosurgeon. (Tr. 512–13). Plaintiff presented to the ER at LMHS on April 30, 2005 and May 1, 2005, with chief complaint of vomiting and was diagnosed with diabetic ketoacidosis and hematemesis. (Tr. 512, 531–33, 483).

Plaintiff presented to CCHD with chief complaint of shoulder/neck degenerative joint disease on May 26, 2005, and June 23, 2005, and he was given medication for pain and instructed to obtain x-rays. (Tr. 832, 834, 827–28). Plaintiff presented to ER at LMHS with complaints of headache, neck pain, right arm pain, and numbness and tingling to both of his arms on July 7, 2005, and was given pain medication and advised to follow up with neurologist. (Tr. 510–11). Plaintiff returned for x-ray results at CCHD on August 4, 2005, after meeting with Dr. Diaz from neurology. (Tr. 824). Plaintiff was advised that the x-ray showed degenerative disc changes at C5-6. (Tr. 824).

Plaintiff presented to the ER at LMHS on September 9, 2005, complaining of low blood sugar where his differential diagnosis was listed to include severe alcohol abuse with end stage liver disease resulting in hypoglycemia. (Tr. 507). On September 27, 2005, Plaintiff presented to the ER with complaints of low blood sugar including symptoms of light-headedness, headache and right arm tingling and was given pain medication. (Tr. 505). During a psychological admission Plaintiff received magnetic resonance imaging without contrast of the shoulder and cervical spine where it was determined that he had a partial tear in his shoulder without evidence of full thickness requiring only physical therapy. (Tr. 481). Plaintiff's spine "demonstrated a mild circumferential disc bulge at C5-6 causing mild central canal stenosis and bilateral neutral

foraminal stenosis as well as unconvertebral joint facet arthropathy and no indication of central canal stenosis." (Tr. 481).

Plaintiff returned to CCHD for a follow up for his diabetes and shoulder pain on November 22, 2005, and he was referred to neurologist. (Tr. 814–16). Plaintiff presented to the ER at LMHS on December 16, 2005, with complaints of chronic shoulder and neck pain where he was prescribed pain medication. (Tr. 496).

On January 28, 2006, Plaintiff presented to the ER at LMHS with complaints of right shoulder pain, arm numbness not associated with weakness. (Tr. 494).. An electrocardiogram and review of his file indicated bulging discs at C5-6. (Tr. 495). On March 31, 2006, Plaintiff presented to the ER at LMHS with chief complaints of vomiting blood and epigastirc abdominal pain where he was diagnosed with diabetic ketoacidosis and gastrointestinal bleed related to alcohol abuse. (Tr. 487, 525–26). Plaintiff underwent an esophagogastroduodenoscopy, on April 2, 2006, which revealed mild to moderate erosive gastritis, small to medium size hiatal hernia, and esophagitis grade 2. (Tr. 479-80, 534, 536).

Plaintiff visited Dr. Muhammed Y. Memon on May 30, 2006, for neck and shoulder pain. (Tr. 564). Dr. Memon noted Plaintiff's strength in his upper extremies as 4/5 for left and 3/5 on the right and intact deep tendon reflexes and prescribed an MRI and x-ray of cervical spine. (Tr. 565, 563, 579, 577). On June 7, 2006, an MRI and X-ray of the cervical spine were taken indicating "[m]ild degenerative disc disease C5-6. No focal herniation is seen. There appears to be some posterior spurring on the right side without any significant foraminal narrowing noted at the C5-6 level at this time." (Tr. 568-69, 572-73).  Dr. Memon concluded Plaintiff should be able to return to his work as a carpenter and recommended he attend physical therapy. (Tr. 562, 576).

Plaintiff was brought to the ER at Peace River on July 16, 2006, concerned that he may have overdosed on Lortab prescription where the final impression was noted as hypoglycemia and drug abuse. (Tr. 556–57). Plaintiff visited S.W. Orthopedic & Sports Physical Therapy (SOS) on August 2, 2006, complaining of neck, shoulder and arm pain/numbness and he was assessed to have cervical radiculopathy with associated restrictions in ROM and strength. (Tr. 582). Notes indicated that Plaintiff's rehab was fair to good. (Tr. 582).

Plaintiff returned to Dr. Memon's office on August 29, 2006, complaining of continued numbness in his arms/hands and pain in the right shoulder area. (Tr. p. 561). He was advised to have a steroid injection, but could not undergo this procedure due to uncontrolled blood sugar, and the need to have an EMG/NCS of both hands. (Tr. 561). After nine visits with SOS on August 29, 2006, Plaintiff was noted to have temporary relief after therapy sessions but continued to experience discomfort typically at the end of a work shift. (Tr. 581). Plaintiff's rehab potential to stabilize pain levels was guarded if he continued to work in heavy labor. (Tr. 581).

On the last recorded visit with Dr. Memon dated September 26, 2006, Plaintiff came in with the same complaints and was advised to continue with vocational rehab and that once his sugar levels were controlled, he would require decompression of the median nerve of the wrist and ulnar nerve at the elbow. (Tr. 560). Dr. Memon also noted that although Plaintiff had degenerative disc disease at level C5-6 with mild forminal stenosis on the right, he believed Plaintiff's symptoms were due to tardy ulnar neuropathy and median nerve compression. (Tr. 560).

Plaintiff was admitted to the ER for hyperglycemia associated with heavy drinking on November 5, 2006, but left against medical advice. (Tr. 882, 879). Plaintiff was readmitted to

Peace River on November 14, 2006, and discharged on November 18, 2006, for alcohol intoxication, hypoglycemia and history of hypertension. (Tr. 876).

On March 8, 2007 and April 9, 2007, Plaintiff visited S.W. Florida Neurological Associates where the doctor viewed an MRI, and determined Plaintiff "should undergo an anterior cervical discectomy and fusion of C5-6 with interbody spacers and anterior cervical plate." (Tr. 645, 47, 49). The surgery was conducted at Southwest Florida Regional Medical Center on April 24, 2007. (Tr. 646, 650-653). Plaintiff tolerated the procedure well. (Tr. 651).

Plaintiff visited Advanced Orthopedic Center on November 21, 2007, for his right shoulder and an x-ray revealed an old distal clavicle fracture that appeared to be mostly healed. (Tr. 751). The doctor recommended that Plaintiff have an MRI and if full thickness presented, surgery would be recommended. (Tr. 751). Plaintiff returned to Advance Orthopedic on December 12, 2007, after having an MRI that was not read as a cuff tear but showed at least partial thickness and likely small full thickness. (Tr. p. 749). Surgery was recommended but the doctor would not proceed until Plaintiff's jaw healed from a recent altercation. (Tr. 749).

Plaintiff was admitted to Peace River from September 16 through 19, 2010 for nausea and vomiting related to his chronic alcoholism. (Tr. 960). On September 20, 2010, Plaintiff was brought to the ER by his family after being found unresponsive due to ketoacidosis. (Tr. 963). Plaintiff was discharged to home in stable condition on October 1, 2010. (Tr. 964). On October 9, 2010, Plaintiff presented to ER with chest pain and apparent intoxication but left against medical advice the following morning. (Tr. 966).

***State Agency Evaluations***

On October 20, 2006, Efren Baltazar, M.D., completed a Physical RFC Assessment for Plaintiff. (Tr. 586-593). Plaintiff's exertional limitations were found to include occasionally

lift/carry 20 pounds, frequently lift/carry 10 pounds, sit/walk 6/8 hours, sit 6/8 hours and unlimited to pushing/pulling. (Tr. 587). Plaintiff was noted to have no postural, visual, communicative or environmental limitations; and the following manipulative limitations: limited to frequent overhead reaching with the right shoulder, limited to occasional feeling with the right hand, and limited to occasional feeling with the last three fingers of the left hand. (Tr. 589–90).

A Psychiatric Review Technique form and Mental RFC Assessment were completed by State Agency Consultant Thomas Conger, Ph.D., on November 2, 2006. (Tr. 594-610). It was noted under the "B criteria" Plaintiff had mild functional limitations for restrictions of activities of daily living and difficulties maintaining social functioning but moderate limitations in difficulties in maintaining concentration, persistence, or pace. (Tr. 604). In his notes, Dr. Conger wrote "[b]ased on the totality of evidence, there is no indication of a mental impairment that would meet or equal any listing at this time," and he associated any limitations or decompensation to Plaintiff's substance abuse problem. (Tr. 606). Dr. Conger also found Plaintiff to be "capable of performing simple, repetitive tasks on a sustained basis if motivated" and to have "adequate understanding, social skills, and adaptation abilities as long as he remains compliant to his treatment recommendations." (Tr. 610).

On February 9, 2007, State Agency Consultant Cristina Rodriguez completed a Physical RFC Assessment making the same findings as previously noted for exertional limitations, visual limitations and communicative limitations; but finding postural limitations to never balance, and limiting climbing, stooping, kneeling, crouching and crawling to frequently. (Tr. 614-617). Ms. Rodriguez also found the following environmental limitations: avoid concentrated exposure of extreme heat or cold, and hazards. (Tr. 617). Ms. Rodriguez found that Plaintiff "should be capable of light RFC." (Tr. 620).

A second Psychiatric Review Technique form and Mental RFC Assessment were completed by State Agency Consultant Arthur Hamlin, Psy. D., on February 21, 2007. (Tr. 622-639). Dr. Hamlin found the same limitations as to the "B criteria" listings as the initial Psychiatric Review Technique form. (Tr. 632). Dr. Hamlin stated in his consultant notes that "[Plaintiff] has the capability of task completion and appropriate social interaction when not abusing." (Tr. 634). Dr. Hamlin concluded that Plaintiff had the "capacity to follow work-like procedures and instructions," "findings reflect adequate attention/concentration to sustain focus in completing selected SRT's," has the "capacity to appropriately interact with others in a structured setting," and retains the ability to adapt and adjust to work when not abusing substances. (Tr. 638).

On February 3, 2009, the Social Security Administration requested additional RFC assessments. (Tr. 884-85). State Agency Consultants, M. Douglass Poirier, M.D., and Douglas Siegel, Ph.D., concurred with the Physical and Mental RFC on record dated February 2007. (See above)(Tr. 886-88).

On October 21, 2010, Maureen A. O'Harra, Ph.D.  conducted psychological examination at the request of the Division of Disability Determination. (Tr. 936). During this evaluation Plaintiff stated that he was twenty-five days sober and denied illicit drug use. (Tr. 936). Dr. O'Harra noted that Plaintiff presented with excellent grooming and hygiene; and there was nothing remarkable about his gait, posture or movements. (Tr. 937). Plaintiff was noted to be friendly, motivated and did not indicate distraction from pain during testing. (Tr. 937). In completing the Medical Source Statement of Ability To Do Work-Related Activities form, Dr. O'Harra only noted moderate limitations in carrying out complex instructions and making complex work-related decisions; she noted mild limitations in understanding and remembering simple instructions, carrying out simple instructions, understanding and remembering complex

instructions and responding appropriately to usual work situations and changes in routine settings. (Tr. 939-940).

On November 29, 2010, Pascal Bordy, M.D. conducted a medical consultative examination at the request of the Office of Disability Determination. (Tr. 943). In past medical history, Dr. Bordy noted Plaintiff's alcohol use as two beers per day and denied any illicit drug use.[6] (Tr. 944). Under the Range of Motion form, Dr. Bordy noted Plaintiff had normal range for all categories except rotation was limited to 45 degrees for the right arm and 70 degrees for the left arm; also pain at the right shoulder during forward elevation, abduction, adduction and external rotation. (Tr. 949). Based on the medical evidence and his evaluation Dr. Bordy determined that Plaintiff was able to sit 3 hours uninterrupted or 4 hours in an 8 hour day; stand 2 hours uninterrupted or 3 hours in an 8 hour day; and walk 2 hours uninterrupted or 3 hours in an 8 hour day. (Tr. 953). He also noted Plaintiff should never reach overhead and only occasionally reach in all other directions with the right arm. (Tr. 954). Plaintiff was also noted to be limited to climb latters or scaffolds occasionally; climb stairs and ramps frequently; and stoop, kneel, crouch and crawl frequently. (Tr. 955). Finally, it was noted Plaintiff had the following environmental limitations: never tolerate dust, odors, fumes, and pulmonary irritants, extreme cold, extreme heat, or vibrations; occasionally tolerates unprotected heights and humidity/wetness; and frequently tolerates moving mechanical parts. (Tr. 956).

## III.    Specific Issues and Conclusions of Law

Plaintiff only raised one issue on appeal. As stated by Plaintiff: (1) the ALJ's decision is not based on substantial evidence. (Doc. 20 at 18).

### A.  The ALJ's decision that Plaintiff does not have a severe psychological impairment is supported by substantial evidence.

---

[6] This information is inconsistent with the medical evidence on record.

Plaintiff argues that the ALJ's finding that Plaintiff's psychological limitations were nonsevere was not supported by substantial evidence when considered in the context that the ALJ also found that Plaintiff's substance abuse was not material. (Doc. 20 at 19). Therefore, the Plaintiff argues that the ALJ erred by not considering Plaintiff's depression in determining his RFC. (Doc. 20 at 22).

In his decision the ALJ used the five step process to determine Plaintiff's qualification for disability benefits. (Tr. 13-15). At step two, the ALJ determined Plaintiff had a combination of severe *physical impairments*[7], but listed no psychological impairments. (Tr. 15)(emphasis added). A severe impairment is one that significantly limits a claimant's physical or mental abilities to perform basic work activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 404.920(a)(4)(ii), (c), 416.921(a); *Bridges v. Bowen*, 815 F. 2d 622, 625 (11th Cir. 1987). Plaintiff had the burden to prove that his psychological impairment was severe enough to cause significant limitations. *See Doughty v. Apfel*, 245 F. 3d 1274, 1278 (11th Cir. 2001).

Additionally, Plaintiff is precluded from a finding of disability if substance abuse is a contributing factor material to a determination that he was disabled. *Id.* at 1275. Plaintiff bears the burden of proving that he would still be disabled whether or not he had substance abuse problems. *Id.* at 1275–76. Consequently, if Plaintiff alleges a mental impairment but the record indicates the psychological impairment is a result of or related to his substance abuse problems, Plaintiff is required to prove his psychological impairment exists with or without the substance abuse. *Id.* "The key factor in this inquiry is whether the claimant would still qualify as disabled if []he stopped using drugs or alcohol." *Sanchez v. Comm'r of Soc. Sec.,* 507 Fed. Appx. 855, 857

---

[7] Plaintiff does not raise any issues or arguments with the ALJ's evaluation of Plaintiff's physical condition. Neither party to this cause has addressed any issues on the substantial evidence supporting the ALJ's finding that Plaintiff retained the RFC for light work with some postural and manipulative limitations. *See Bechtold v. Massanari*, 152 F.Supp.2d 1340, 1346–47 (M.D. Fla. 2001) (stating that failure to raise an issue constitutes a waiver), *see also Persichilli v. Commissioner of Soc. Sec. Admin.*, 246 Fed. Appx. 613, 615 (11th Cir. 2007).

(11th Cir. 2013). If the ALJ finds the claimant would no longer be disabled if he stopped abusing substances, then the claimant's substance abuse is considered a "contributing factor material to the determination of [his] disability," and he would be found to have failed to meet his burden of proving disability. *Id.* At 857–58 (quoting 20 C.F.R. §§ 404.1535(b)(2)(i), 416.935(b)(2)(i); 42 U.S.C. §§ 423(d)(2)(C)).

In this case, Plaintiff argues that the ALJ erred by "conclud[ing] that alcohol [was] not material or a contributing factor while, at the same time, concluding that [Plaintiff's] psychiatric conditions are non-severe." (Doc. 20 at 19). Nonetheless, Plaintiff misstates the ALJ's determination as to the materiality of Plaintiff's substance abuse problem because the ALJ found that Plaintiff "ha[d] no more than mild mental limitations whether or not his alcohol abuse [was] considered." (Tr. 15-16). Therefore, as explained in *Sanchez*, the ALJ determined that Plaintiff's substance abuse was not material because it did not make his psychological impairment severe, nor was his psychological impairment severe absent his substance abuse problem.

Although the record does support a diagnosis of depression, Plaintiff still had the burden to prove that this impairment affected his ability to complete basic work activity. *See Bowen*, 815 F. 2d at 625. Contrary to Plaintiff's position, as discussed by the ALJ, the record as a whole did not support a finding that Plaintiff's depression limited his ability to perform basic work activity. (Tr. 13, 15-20, 112-13). As noted by Plaintiff throughout his brief, Plaintiff's medical records for his psychological impairments dating back prior to his alleged onset date through the date of the ALJ's decision are consistently intertwined with admissions related to detoxification or substance abuse. (Doc. 20 at 19-22) (Tr. 717, 444, 452, 457, 463, 427, 437, 482-504, 358-424, 655-85, 720-31, 736-42, 772-87, 864-76, 894-935 etc.). The ALJ stated clearly in his opinion that the record as a whole supported a finding that Plaintiff seemed to remain mentally stable

when he is not engaged in any substance abuse and remained compliant with treatment. (Tr. 15). Nonetheless, the ALJ determined that substance abuse was not material, relying on the overall evidence of record and psychological consultative examiner Maureen O'Harra, Ph.D., to whom he gave great weight. (Tr. 18). Dr. O'Harra determined that despite Plaintiff's long standing history with substance abuse his mental functioning was relatively intact with regard to mental elements of work. (Tr. 15, 938). It is relevant to note that Plaintiff did not complain of depression nor was depression even mentioned during this psychological evaluation dated October 21, 2010. (Tr. 936-38).

Plaintiff relies on the opinion of Dr. Tilson, who conducted a psychological evaluation of Plaintiff in 2007. (Tr. 732). Plaintiff states in his brief that "Dr. Tilson stated that the results of the testing may have underestimated [Plaintiff's] true abilities due to [his] depression, concentration difficulties, low blood sugar and alcohol use." Nonetheless, Plaintiff once against misstates the record. Dr. Tilson actually stated that Plaintiff's test results may have been underestimated "due to problems with concentration/attention caused by either the effects of low blood sugar, depression *or* alcohol use." (Tr. 734)(emphasis added). Consequently, Dr. Tilson did not definitively determine that Plaintiff's depression was the cause for Plaintiff's low test scores as Plaintiff argues. Dr. Tilson did however relate Plaintiff's depression to his alcohol-dependence, therefore, not only going against Plaintiff's argument but further validating the ALJ's decision. (See, Tr. 735).

Substantial evidence supported the ALJ's decision to give little weight to Dr. Tilson's finding that Plaintiff was "not capable of competitive employment." (Tr. 17). As noted by the ALJ, Dr. Tilson's opinion that Plaintiff "was not capable of competitive employment" was not entitled to any significant weight because Dr. Tilson opined on an issue reserved to the Commissioner. *See Bell v.*

*Bowen*, 796 F. 2d 1350, 1353-54 (11th Cir. 1986) (finding that a doctor's opinion on an issue reserved for the Commissioner should not be afforded great weight). Further, Dr. Tilson only examined Plaintiff on one occasion; therefore Dr. Tilson is not considered his treating physician. (Tr. 17). *See Crawford v. Comm'r of Soc. Sec.*, 363 F. 3d 1155, 1160 (11th Cir. 2004) (stating that a doctor who examines a claimant on only one occasion is not a treating physician).   The ALJ properly noted that Dr. Tilson's evaluation of the Plaintiff was conducted during a period of substance usage unlike Dr. O'Harra's evaluation which occurred when the Plaintiff had been sober for twenty-five days. (Tr. 732-35, 936-38). Therefore, contrary to Plaintiff's argument that the ALJ substituted his opinion for that of a medical professional, the ALJ in the instant cased simply weighed the evidence of record as a whole and did not diagnose or render any opinions ordinarily performed by a doctor.

**IV.    Conclusion**

The ALJ's decision in the instant case is supported by substantial evidence. The ALJ properly determined Plaintiff's psychological impairment caused no more than mild limitations, whether or not substance abuse is considered.

Accordingly, it is **RESPECTFULLY RECOMMENDED** that:

The decision of the Commissioner be **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this  22nd  day of

August, 2013.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record